**Roy E. MASSENGILL, Appellant,**

v.

**Raymond JONES et al., Appellees.**

No. 6985.

Court of Civil Appeals of Texas.

Texarkana.

Dec. 17, 1957.

Rehearing Denied Jan. 14, 1958.

**536**

---

L. F. Burke, Longview, for appellant.

Kenley, Sharp, Ritter & Boyland, Earl Sharp, Longview, Bean & Ford, Foster T. Bean, Kilgore, Smead & Harbour, Longview, for appellee.

FANNING, Justice.

Roy Massengill, as plaintiff brought suit against Raymond Jones and Cherokee Water Company, alleging that defendant Cherokee Water Company had issued shares of stock and made leases with 1,500 parties on lots fronting on Cherokee Lake, including plaintiff Massengill and defendant Jones, with Massengill and Jones having adjacent lots on the lake, with plaintiff further alleging that each of said leases contained a provision as follows: "With the exception of a landing pier and boat-house, no structure shall be built nearer than seventy-five feet from the spill-way water level of said lake, nor shall boat piers or structures be extended into boat roads," and alleging that the placing of such provision in each of the said 1,500 leases created a general building scheme or plan of development of the lots bordering on said lake designed for the purpose of making the lake and land more attractive for residential purposes and as an inducement to each lessee to lease from the lessor an individual lot, and that such alleged restriction inured to the benefit of each lessee who could sue to enforce same, and further alleged that Jones violated said alleged restrictive covenant by building (or commencing the building) of a concrete block house within 35 or 40 feet from the spill-way water level of said lake. Plaintiff sought an injunction against Jones to restrain him from completing the building and a mandatory injunction to require the removal of the building. Plaintiff also sought an injunction against the defendant Cherokee Water Company to enjoin it from refusing to stop Jones from completing the structure or from occupying same and from refusing to enforce the alleged restrictive covenant in question, etc.

The trial on appellant's application for permanent injunction was had before the court without the intervention of a jury. At the conclusion of plaintiff's evidence the defendants moved the court for judgment in their favor, which was granted. The trial court filed findings of fact and conclusions of law. Appellant's request for amended findings of fact and conclusions of law were denied by the trial court. Massengill has appealed from the judgment of the trial court.

We have carefully reviewed the record and conclude that the trial court correctly rendered judgment for appellees. As hereinafter stated, we think there are several good and sufficient independent reasons why the judgment of the trial court should be affirmed.

■ First: The burden of proof was upon Massengill to show that Cherokee Water Company owned the Jones lot in question. This appellant failed to prove to the satisfaction of the trial court which found that the lot was owned by Jones. We have carefully reviewed the evidence and it is our opinion that Massengill failed to meet the burden of proof cast upon him to prove that such lot was owned by Cherokee Water Company. Furthermore, Cherokee Water Company did not even claim the lot but in effect in its pleadings judicially admitted that it did not own said lot.

**Second:** The burden of proof was upon Massengill to show that Cherokee Water Company and defendant Jones executed a valid lease containing the alleged restrictive covenant in question on lot NQ 24–A, the lot in question. This appellant failed to do to the satisfaction of the trial court which found to the contrary. No executed lease covering the lot in question between Cherokee Water Company and defendant Jones was ever offered in evidence in the cause. Appellant sought to establish that such a lease was executed by the testimony of Guy Lamb, Secretary of the Water Company, attempting to show by Lamb and the records of the Water Company that such character of lease was mailed to Jones at his mailing address at Kilgore, Texas, however on cross-examination Mr. Lamb testified positively as follows: "Q. Now, Mr. Lamb, this one question. You have no record of any lease agreement entered into between Mr. Jones and the Cherokee Water Company, at all, do you?" "A. No, sir." Appellant also points to the evidence of Mr. Lamb wherein he testified to the effect that the records of the Water Company showed that Jones had paid the annual rental charges on lot NQ 24–A from 1950 to 1957. Appellee Jones in his brief contends that the evidence of Lamb indicates that there was some confusion in the records of the Water Company with reference to Lot 22 (another lot which Jones claimed ownership of) and Lot NQ 24–A, and contends that the rentals on lot NQ 24–A were not due to be paid by Jones since the Water Company did not own lot NQ 24–A, but that Jones owned lot NQ 24–A. We have carefully reviewed the evidence and hold that appellant did not discharge the burden of proof incumbent upon him to prove that there was ever a valid lease executed by Jones and the Water Company covering lot NQ 24–A.

**Third:** The burden of proof was upon Massengill to establish that Cherokee Water Company had a general building plan or scheme to restrict the construction of dwellings at a distance of not less than 75 feet from the spill-way water level of the lake. Appellant failed to prove this to the satisfaction of the trial court. The only proof offered by appellant on this issue was to the effect that the Cherokee Water Company had executed some 1500 leases containing the 75-foot provision.

In 12 Tex.Jur., p. 169, Sec. 106, it is stated:

"Presumptions with regard to conveyances, import the greatest possible estate and the least restriction upon the use of the property granted compatible with the language of the deeds. *The mere fact that various deeds from a common grantor contained the same restrictions has been held to be insufficient to show that the establishment of a general plan or scheme was intended,* or that such restrictions were imposed for the benefit of any other lots conveyed by the grantor since the existence of such a general plan or scheme depends not upon the intent of the common grantor alone but upon the joint intent of the grantor and grantees." (Italics ours.)

In 14 Am.Jur., p. 613, Sec. 202, it is stated:

"One of the most common forms of creating building restrictions is by the establishment of a general building plan covering a tract divided into a number of lots. As already shown, where such a plan is created, the conveyance of a lot or lots therein raises an implied covenant restricting the remaining lots. The conveyance of several lots or tracts by deeds incorporating building restrictions indicates a purpose to adopt a general building plan, especially where a grantee of lots conveys one to one person and later a contiguous lot to another, incorporating in each deed the building restrictions under which he holds his title. *However, conveyance in this manner is not, according to the better view,*

*of itself sufficient to create such a plan.* The most common test of the existence of a general building or neighborhood scheme is an intent that the protection of the restrictive agreements inure to the benefit of the purchasers of the lots in the tract. Such an intent is said to arise from representations as to the restriction, made for the purpose of inducing the purchasers of the several lots to pay higher prices because of the restriction." (Italics ours.)

In Pierson v. Canfield, Tex.Civ.App., 272 S.W. 231, 233, it is stated:

"The right of appellees to enforce covenants in the deed, under which appellant claims, to which they are neither parties nor assigns, necessarily depends on a showing that the covenants were entered into for the benefit of their property. There is nothing in the deed, or in the evidence otherwise, indicating that the parties to the deed intended the covenants for the benefit of either prior or subsequent puchasers from the common grantor. On the issue of fact, as to the existence, whether or not of a uniform scheme of construction in settling the addition, the only evidence before the court are the four deeds containing identical restrictions as to the use of the lots. Three were executed by the common grantor to the persons under whom appellees Canfield, Killough, and Martins claim title, the other is the deed executed by the common grantor to the party under whom appellant claims. There is no language in these deeds referring to a common scheme of restrictive settlement or other evidence of any agreement whatever between the grantor and the grantees that the lot, or lots, were conveyed subject to, or as a part of, any such scheme.

"*The fact that these deeds contained identical restrictions would not, in our opinion, be sufficient of itself to es-* tablish the existence of a general scheme, or that the restrictions in the deed under which appellant claims were intended for the benefit of any other lot, or lots, conveyed by the common grantor.* It may be true that the coincidence of the execution of deeds, by the common grantor containing identical restrictions as to the use of the lots, shows that the common grantor had in mind a general plan, but the intent of the grantor alone cannot control, it requires the joint intent of grantor and grantee, and, as between them, the instrument, or instruments, exchanged and forming a part of the transaction constitute the final and exclusive evidence of the intent of the parties and of the covenants entered into.

"The right claimed by appellees to enforce against appellant restrictive covenants as to the cost and location of buildings on the lot owned by him, is, if it exists at all, a servitude running with the land in favor of the lots owned by appellees and against the lot owned by appellant. Such servitude or burden, curtailing the liberty of the owner to use and improve his property as he chooses, is an interest of such magnitude as to constitute an estate in lands, and, as such, must be * * * created as other such servitudes, interests and estates in lands are required to be created." (Italics ours.)

In Davis v. Skipper, 125 Tex. 364, 83 S. W.2d 318, 321, it is stated:

"The existence of an 'easement' or 'equity' in a tract of land growing out of restrictive covenants as to use can hardly be conceived except in connection with another tract of land, which may be said to be the dominant estate and for which the easement or equity is created. In every case where parties seek to enforce a restrictive covenant the burden of proof is upon them to establish that the covenant was im-

posed on defendant's land for the benefit of land owned by them. It is also well settled that in the absence of proof that a restriction was imposed for the benefit of other land, it is construed as a personal covenant merely with the grantor. In many instances it is held that unless it is expressly shown in the conveyance itself that the restriction is imposed for the benefit of other land, or unless there is an obvious purpose to sell in accordance with a general plan, the covenant must be construed as merely a personal one."

Mr. Lamb, Secretary of Cherokee Water Company, and a witness called by the plaintiff, testified to the effect that in all of the meetings of the Water Company he attended prior to the execution of the 1,500 leases he had heard of no discussion of a general building plan or scheme with reference to the inclusion of the 75-foot provision in the leases, that there were no minutes or records of the Water Company to that effect, and further testified as follows: "Q. Now, you stated a while ago that so far as you know, the reason behind the inclusion in the lease agreement of the seventy-five foot provision as well as certain other provisions, was to comply with your contract with the City of Longview, is that correct? A. Yes, sir." The defendant Cherokee Water Company in its answer also made the following judicial admission:

"Further answering, this Defendant states that the primary purpose behind the inclusion in each lease agreement of provisions relating to the building of houses and improvements in connection therewith on the lots bordering Lake Cherokee was to comply with the Health and Sanitary Regulations of the City of Longview, with whom this Defendant is under contract for the delivery of water for use by the City of Longview in its water system, and that this Defendant never intended to create any general building scheme or

plan of development on the lots bordering Lake Cherokee by the inclusion of these provisions in said lease agreements. This Defendant further states that insofar as it knows or is informed all houses and improvements constructed on the lots bordering Lake Cherokee, whether such lots are held under a lease from Cherokee Water Company, Incorporated or not, have been or are in the process of being constructed in compliance with the Health and Sanitary Regulations of the City of Longview."

We quote from plaintiff Massengill's testimony as follows:

"Q. Now, then, you never had, you have never had any discussion with the lake officials or any of them with reference to these particular building restrictions other than talking to Mr. Lamb, have you? A. No sir, but I have understood them.

"Q. I understand, but you haven't had any discussion about these restrictions with anybody on the lake either before or after you bought that property except Mr. Lamb, have you? A. And Mr. Hall.

"Q. And you have never been advised by them that there was any general requirement or scheme over the entire lake requiring building houses back 75 feet, have you, any general scheme? A. Sir, my lease provides for 75 feet and I have observed that, in other words, I have believed that to mean what it says, and I didn't feel like I had to run to any official of the Cherokee Water Company to tell me what it was.

"Q. Then as far as you are concerned you have no idea what intent that the Cherokee Water Company had with reference to any kind of building restrictions, do you, other than what is in your lease? A. That's right.

"Q. That's all you know about it? A. Yes.

"Q. Whether or not the purpose for which that was put in there or the authority by which it was put in there, you have no other information other than what has gone into the record in this case, do you, Mr. Massengill? A. No, sir, it does not say why it was put in there."

The record in this case shows that Cherokee Lake was constructed primarily as a place of recreation and that a contract was entered into with the City of Longview allowing the City to take water from the lake. There is nothing in the record which would show that anybody except plaintiff Massengill has ever contended that there was a general building scheme. Cherokee Water Company, which would be the most interested party if such a general building scheme was in existence, has no minutes or records of such a scheme, and in its pleadings judicially admitted it did not have such a general building scheme. There is also no evidence in the record that plaintiff Massengill purchased a share of stock relying on any general building scheme. The Rules and Regulations for Lake Cherokee, adopted by the Board of Directors of the defendant Water Company do not contain any restrictions as to distance of structures from the water line. The lease form of defendant Water Company does not contain any restrictions as to the size, type or cost of structures located on the leased lots. The form lease also specifically provides that it shall not be transferred without written consent of the lessor and that any attempted assignment without such consent would terminate the lease.

As above stated, the only evidence offered by appellant to prove a general building scheme was the testimony that 1,500 leases of the Water Company contained the 75-foot provision above referred to. The burden of proof was on Massengill to prove the general building plan or scheme. We think the trial court correctly held that

Massengill failed to meet the burden incumbent upon him in this respect. 12 Tex. Jur., p. 169; Pierson v. Canfield, Tex.Civ. App., 272 S.W. 231; Davis v. Skipper, 125 Tex. 364, 83 S.W.2d 318; Monk v. Danna, Tex.Civ.App., 110 S.W.2d 84, wr. dis.

■■ Fourth: Independent and irrespective of the three reasons above given for affirmance of the judgment of the trial court, the judgment of the trial court should be affirmed because the record in this case shows that a mandatory injunction would operate inequitably and oppressively as far as defendant Jones is concerned, would not benefit Massengill, and that the trial court did not abuse the judicial discretion lodged in him to deny the mandatory injunction under the record in this case. Plaintiff Massengill offered no proof of any damages whatever. If he was damaged in any respect it was certainly highly inconsequential. We quote from Massengill's testimony as follows:

"Q. Your counsel has stated and you agree with him that the question of damage has no place in these things * * * A. I think the Cherokee Water Company has every right to enforce their lease agreement.

"Q. I'm talking about yours, Mr. Massengill. A. I'm not certain about that.

"Q. On the same basis that you are filing against Mr. Jones here, you feel like you have the right to file against Judson Bagwell and Doctor Queen and everybody else out there that's closer than 75 feet, don't you? A. No, sir."

Jones' concrete block dwelling house is completed—he would be seriously damaged if he were compelled by mandatory injunction to remove the structure. Appellant Massengill has no improvements on his property except a boat house, walkway and fence—Massengill has no objection to the Bagwell house 60 feet from his lot in violation of the purported 75-foot restriction. The trial court also found to the ef-

fect that Massengill was not prompt in making objections to Jones' building the structure and knowingly allowed Jones to nearly complete the structure before registering objections thereto with Jones.

In 24 Tex.Jur., p. 136, Sec. 96, it is stated:

"In determining whether an injunction shall issue the equities of the case are considered; the convenience and hardships that may result from the granting or refusing of the writ are balanced. The Court will consider whether there is a probability of greater damage to the defendant if the writ be granted than to the plaintiff if it be denied. This rule is most frequently applied to temporary injunctions but it is applicable also to final permanent injunctions * * *. The destruction of buildings and works in existence at the greater expense and injury of the defendant and the slight advantage of the plaintiff should not be required, especially by a mandatory or permanent writ. In doubtful cases, an injunction should be refused.

"The balancing of conveniences doctrine is most frequently applied in nuisance cases, and in cases involving restrictive covenants."

In Nolte Irr. Co. v. Willis, Tex.Civ. App., 180 S.W.2d 451, 455, wr. ref., w. m., it is stated:

"The question for determination then resolves itself into whether or not the violation of the terms of the statute by the appellee, causing even a slight injury to the appellant, entitles the appellant to the benefits of a mandatory injunction * * *. The terms of the statute do not expressly provide for the remedy of mandatory injunction as a matter of right, but the injured party is expressly accorded 'remedies * * * in equity,' as well as damages * * *. The authorities are uniform in holding that the extraor-

dinary remedy of permanent mandatory injunction compelling the alteration, destruction, or removal of property should be granted with great caution and should not be granted unless serious injury is being inflicted or, in all probability, will be inflicted.

\*     \*     \*     \*     \*

" 'Although the existence of this power in a court of equity is generally recognized, it is not regarded with any considerable degree of favor. Courts are reluctant to exercise it, and they act with caution and only in cases of necessity.' * * *

"The appellant contends that, inasmuch as the appellee admitted that he had no permit from the Board of Water Engineers to impound the surface waters and inasmuch as the court found that he was diverting surface waters and inflicting some degree of injury upon appellant, that the appellant was ipso facto entitled to a writ of mandatory injunction * * *. We are not in accord with this contention. * * *

"We are of the opinion, however, that, inasmuch as the statute upon which the appellant relies does not specifically direct the granting of an injunction in the event surface waters are diverted or impounded in such a manner as to damage the property of another, the appellant is subject to the general rules of equity as above set out and must show serious injury or threatened injury before he would be entitled to the extraordinary remedy which he seeks. The statute merely guarantees to the appellant the right to recover damages if he can show damage, and the right of equitable relief if he establishes facts which will bring him within the purview of the equitable rules authorizing equitable relief. *In the instant case the appellant has failed to convince the trial court that his damage was serious or*

*will be serious and has failed to show conditions of such a nature as to make it an abuse of discretion on the part of the trial court in refusing to issue the mandatory injunction."* (Italics ours.)

In 43 C.J.S. Injunctions § 87, p. 595, it is stated:

"* * * However, the breach of the restrictive covenant does not entitle plaintiff to a mandatory injunction directing the removal of a building or structure as a matter of right. Whether such an injunction shall issue depends on all the equities between the parties. The breach must be very clear to justify a mandatory injunction, and it is essential that the common scheme of building should have been actually preserved. A mandatory injunction may be denied when it will operate inequitably and oppressively, or where there has been nothing more than a mere breach of a negative legal right which is not injurious or detrimental in any way to plaintiff's rights, or where the injury complained of is not serious or substantial and may be readily compensated in damages, while to restore things as they were before the acts complained of would subject defendant to great inconvenience and loss, especially where defendant has acted in good faith. The application must be promptly made and relief will be denied where plaintiff has been guilty of laches or has waived or acquiesced in the violation."

We hold that this record does not show an abuse of discretion on the part of the trial judge in refusing the mandatory injunction sought by appellant.

We deem it unnecessary to discuss the additional grounds relied on by appellees for affirmance as we deem the reasons hereinbefore stated as ample grounds for affirmance of the judgment of the trial court.

None of appellant's points are deemed to present reversible error in this cause. The judgment of the trial court is affirmed.

Affirmed.

CHADICK, C. J., concurs.

DAVIS, J., dissents.

DAVIS, Justice (dissenting).

I dissent. The opinion of the majority is in direct conflict with the following decisions: Monk v. Danna, Tex.Civ.App., 110 S.W.2d 84, wr. dis., and Stanford v. Brooks, Tex.Civ.App., 298 S.W.2d 268.

In Monk v. Danna, supra, 110 S.W.2d at page 86, the following statement, applicable to this case, is found:

"* * * However, as contended by appellees, the doctrine has so often been announced in this state and by courts the country over, as not to admit of further debate, that, where the owner of a tract of land subdivides it and sells distinct parcels thereof to separate grantees, imposing restrictions upon its use pursuant to a general plan of development or improvement, such restrictions may be enforced by any grantee against any other grantee, either upon the theory that there is a mutuality of covenant and consideration, or upon the ground that mutual negative equitable easements are created. Where parcels are sold with reference to such a uniform plan to persons having notice thereof, the grantees may enforce the restrictions within this rule, irrespective of the order of the several conveyances, and irrespective of whether the covenants run with the land." (Citing cases.)

In addition to the foregoing reason for dissenting, I wish to point out that Lake Cherokee and the City of Longview have taken the position in this case which is

not only contrary to the record, but would result in considerable embarrassment between them and other persons similarly situated as Massengill and Jones. Lake Cherokee acquired the property involved in this suit by a deed from B. L. Thornton and wife. The defendants offered that deed in evidence, which proved Lake Cherokee's title and they are bound by every statement and recitation in that deed. Lock v. Morris, Tex.Civ.App., 287 S.W.2d 500, wr. ref., n. r. e., and authorities therein cited. In that deed Thornton only reserved the right to select a campsite, which he did. That campsite was later divided into three lots, two of which are involved in this lawsuit. If Lake Cherokee does not own the lot occupied by Jones, it does not own the lot occupied by Massengill. Under the position taken by Lake Cherokee in this case, Massengill could build an open-type toilet at the water's edge, facing it away from the water, and there is not anything that either Lake Cherokee or the City of Longview could do *by virtue of their contract*. Lake Cherokee has taken a position inconsistent with the deed which they offered in evidence.

Further, the evidence in this case does show that a lease was executed and mailed by Lake Cherokee to Jones, although their secretary did testify that they made no record of the lease other than the notation that it was mailed. The fact that Jones paid the rentals on the lease from the time the secretary of Lake Cherokee testified that he mailed the lease to Jones until the date of the trial is evidence that Jones had a lease.

In view of the inconsistent position taken by Lake Cherokee relative to the ownership of the property involved in this suit, which position is inconsistent with the deed itself, the case should be reversed and remanded for a new trial because it could result in much litigation between Lake Cherokee and many others similarly situated around the Lake. The record shows that many persons from whom property was acquired for the construc-

tion of Lake Cherokee were given the privilege of reserving a campsite on the Lake. The record does not show how many different property owners land was acquired from, but it does show that there are some 1,500 lots for campsites around the Lake.

The judgment should be reversed and remanded for a new trial.